## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CARNITA GARROUTTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-06-78-CH |
| | ) | |
| MICHAEL J. ASTRUE,[1] | ) | |
| COMMISSIONER OF THE SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Ms. Carnita Garroutte, brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of Defendant Commissioner's final decision denying Plaintiff's application for disability insurance benefits.  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the exercise of jurisdiction over this matter by a United States Magistrate Judge.  The Commissioner has answered and filed the administrative record ("AR"), and both parties have briefed their respective positions.  For the reasons stated below, the Commissioner's decision is reversed and remanded for further proceedings.

## I.      Procedural History

Plaintiff protectively filed her application for disability insurance benefits on October 24, 1996, alleging that she became disabled on May 1, 1995, because of cervical degeneration with resulting pain in her neck, arms, hands, legs, back and head.  The Social

---

[1]Michael J. Astrue was confirmed as Commissioner of Social Security on February 1, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is hereby substituted for Commissioner Jo Anne B. Barnhart as the defendant in this suit.

Security Administration denied Plaintiff's application initially and on reconsideration. Plaintiff requested a hearing, and an administrative law judge (ALJ) held a *de novo* hearing on August 18, 1998. Plaintiff appeared in person with an attorney and offered testimony in support of her application. A vocational expert (VE) also appeared and testified at the request of the ALJ. The ALJ issued his decision on December 4, 1998, finding that Plaintiff was not disabled within the meaning of the Social Security Act and thus was not entitled to disability insurance benefits.

The Appeals Council granted Plaintiff's request for review and remanded the case to an ALJ on January 30, 2001. A different ALJ conducted a second hearing on October 11, 2001. Plaintiff appeared in person with an attorney and testified. A medical expert (ME) and a VE also appeared and testified at the ALJ's request. The ALJ issued his decision on November 29, 2001, finding that Plaintiff was not disabled. The Appeals Council denied Plaintiff's request for review on September 5, 2002, and the decision of the ALJ became the final decision of the Commissioner.

Plaintiff appealed to this Court, again challenging the ALJ's rejection of the opinion of her treating physician, Dr. Mackey. She also challenged the ALJ's determination of her residual functional capacity (RFC). The matter was referred to Magistrate Judge Doyle Argo who, after a thorough review of the medical evidence and analysis of the ALJ's decision, determined that the ALJ had failed to adequately explain how much weight he was giving Dr. Mackey's opinion. This Court adopted Judge Argo's recommendation, and the case was reversed and remanded for further proceedings.

Plaintiff appeared with a representative and testified at a third hearing on September 8, 2005.  On September 23, 2005, the ALJ issued another unfavorable decision.  It is this decision which is the subject of judicial review in the current action.

## II.   The ALJ's Disability Determination

In his written decision, the ALJ applied the five-step sequential evaluation process, *see Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005), and found at step one that Plaintiff had not engaged in substantial gainful activity since May 1, 1995, the alleged onset date.  At step two, the ALJ determined that Plaintiff suffers from severe impairments including degenerative disc disease of her cervical and lumbar spine with arthritic changes and associated headaches, surgical removal of bunions and surgical correction of hammertoes.  At step three, the ALJ found no impairment or combination of impairments that meets or equals the criteria of any listed impairment described in the regulations.  The ALJ then concluded at step four that Plaintiff retains the RFC to lift twenty pounds occasionally and ten pounds frequently, that she can stand/walk six hours out of an eight-hour workday, that she can sit six hours in an eight-hour workday, and that she can climb stairs frequently, balance occasionally, stoop occasionally, and kneel, crawl, or crouch occasionally.  The ALJ found that Plaintiff could not reach overhead.  Relying on the testimony of a VE, the ALJ determined at step four of the sequential analysis that Plaintiff is capable of performing her past relevant work as court clerk and accountant.

### III.   <u>Plaintiff's Claims</u>

Plaintiff contends that the ALJ erred in failing to properly evaluate the opinions of Plaintiff's treating physician, Dr. Mackey.   Plaintiff also contends that the ALJ's determination of her credibility was contrary to law and not supported by substantial evidence.   Finally, Plaintiff contends that the ALJ's determination of her RFC is not supported by substantial evidence.

### IV.   <u>Standard of Review</u>

Judicial review of the Commissioner's final decision is limited to determining whether the factual findings are supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.  *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005).   "[S]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).   A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it.  *Branum v. Barnhart*, 385 F.3d 1268, 1270 (10th Cir. 2004).  A court considers whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases but does not reweigh the evidence or substitute its own judgment for that of the Commissioner.  *Hackett*, 395 F.3d at 1172 (quotations and citations omitted).

V.    **Analysis**

A.    **The ALJ's Analysis of Treating Physician's Opinion**

This Court reversed the ALJ's November 29, 2001 decision, the second ALJ decision in this case, based on Judge Argo's finding reversible error in the ALJ's failure to divulge how much weight he was giving the opinion of Plaintiff's treating physician, Dr. Mackey, and the basis for the assigned weight.[2]

Under the "treating physician rule," greater weight is generally given to the opinions of sources of information who have treated the claimant than to the opinions of those who have not. *See Hackett*, 395 F.3d at 1173-1174 (*citing Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004)).  First, the ALJ must determine whether the opinion of a treating source should be given controlling weight. *Id.* at 1174.  Using a sequential analysis, an ALJ is required to give the opinion of a treating physician controlling weight if it is both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques;" and (2) "consistent with other substantial evidence in the record." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (quotation omitted).  If an opinion fails to satisfy either of these conditions, it "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *4).  Non-controlling opinions "'are still entitled to deference and must be weighed using all of

---

[2]  The Appeals Council had remanded the December 4, 1998 decision based on the lack of analysis of Dr. Mackey's opinion and had instructed the ALJ to consider Dr. Mackey's opinion under the framework specified in 20 C.F.R. § 404.1527 and Social Security Rulings 96-2p and 96-5p.

5

the factors provided in 20 C.F.R. § 404.1527 and 416.927.'" *Watkins* at 1300.  Those factors are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.  *Id.* at 1301 (quotation omitted).  If the ALJ chooses to reject a treating physician's opinion entirely, the ALJ must set forth specific legitimate reasons for doing so.  *See Langley v. Barnhart*, 373 F.3d at 1119.

The relevant portion of the ALJ's November 29, 2001 decision states:

> As noted above, Dr. Mackey's conclusion that the claimant is totally disabled cannot be accepted, as it is reserved to the Commissioner.  However, he offered a detailed assessment that the claimant would be limited to lifting no more than ten pounds.  His opinion regarding the claimant's capacity for lifting conflicts with other substantial evidence in the record.  For instance, Dr. Hisey has concluded that the claimant could lift as much as twenty pounds.  Dr. Goldman [the medical expert at the hearing] also offered a varying and persuasive assessment during his testimony at the supplemental hearing.  He did not examine the claimant, but Dr. Goldman had the benefit of considering more evidence than Dr. Mackey in making a determination.  Dr. Mackey also opined that the claimant would be unable to sit, stand and walk for more than a total of six hours in an 8-hour workday.  However, Dr. Mackey's opinion is not supported by evidence.  The claimant's most severe impairment involves her neck.  Thus, the limitations proposed by Dr. Mackey are not more persuasive than those put forth by Dr. Goldman.

AR 20.  Judge Argo concluded that the ALJ's decision resolved the "controlling weight" issue but failed to answer the final question regarding the weight assigned to Dr. Mackey's opinion.

The section of the ALJ's latest decision regarding the medical opinion of Dr. Mackey is identical to that of his previous decision except for the omission of the reference to Dr. Goldman's testimony:

> As noted above, Dr. Mackey's conclusion that the claimant is totally disabled cannot be accepted, as it is reserved to the Commissioner.  However, he offered a detailed assessment that the claimant would be limited to lifting no more than ten pounds.  His opinion regarding the claimant's capacity for lifting conflicts with other substantial evidence in the record.  For instance, Dr. Hisey has concluded that the claimant could lift as much as twenty pounds.  Dr. Mackey also opined that the claimant would be unable to sit, stand and walk for more than a total of six hours in an 8-hour workday.  However, Dr. Mackey's opinion is not well supported by evidence.  The claimant's most severe impairment involves her neck.

AR 607.  In the November 29, 2001 decision, the ALJ stated that Dr. Mackey's opinion conflicted with the testimony of Dr. Hisey and the non-examining ME.  In the decision currently under review, the ALJ stated only that Dr. Mackey's opinion conflicted with the evidence obtained from Dr. Hisey.  In neither decision did the ALJ complete the analysis required by the regulations and *Watson*.  Moreover, the ALJ stated in both decisions that Dr. Hisey's opinions are "varied and internally inconsistent[]" and that "his opinions received only limited weight."  AR 20, 607.  It is difficult, if not impossible, to reconcile the ALJ's

use of Dr. Hisey's opinions of "limited weight" to justify the rejection of Dr. Mackey's opinions.[3]

The limitations found by Dr. Mackey are supported by the findings of other treating doctors.  For example, Dr. Smalley and Dr. Knight both expressed opinions that Plaintiff is unable to work.  AR 272-273, 336-339.[4]  Because the ALJ failed to follow the correct legal standards in considering the opinions of Dr. Mackey, this case is reversed and remanded for further proceedings.

## B.    The ALJ's Credibility Assessment

Plaintiff bases her disability claim in part on the pain resulting from the degeneration of discs in her neck.  An ALJ's assessment of the severity of a claimant's pain necessarily requires the ALJ to consider the claimant's credibility.  Plaintiff takes issue with the ALJ's conclusion that Plaintiff's testimony regarding her subjective complaints of pain were not fully credible.

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quotation omitted).  Moreover, to be considered disabling, pain must be so severe, either by itself or combined with other impairments, that

---

[3]At one point, Dr. Hisey expressed the opinion that Plaintiff should have a 20 pound lifting restriction with no repetitive motion of the cervical spine (AR 288-289), but both before and after the dates of those opinions, he found she should have a 10 pound lifting restriction.  AR 290-291, 325-26.

[4]Detailed medical findings accompany these opinions.  Other medical evidence also supports Dr. Mackey's opinions.  A summary of the medical evidence follows.

it precludes any substantial gainful employment.  *See Brown v. Bowen*,  801 F.2d 361, 362-363 (10th Cir. 1986).  "A claimant's subjective allegation of pain is not sufficient in itself to establish disability."  *Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993).  Rather, "[b]efore the ALJ need even consider any subjective evidence of pain, the claimant must first prove by objective medical evidence the existence of a pain-producing impairment that could reasonably be expected to produce the alleged disabling pain."  *Id.* (citations omitted).  The Tenth Circuit Court of Appeals has explained the proper analysis of subjective allegations of pain:

> The framework for the proper analysis of Claimant's evidence of pain is set out in *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987). We must consider (1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the Claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling.

*Id.* (quotation omitted).   In assessing an individual's credibility regarding symptoms, the administrative law judge should consider such factors as:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991) (*citing Huston v. Bowen*, 838 F.2d 1125 (10th Cir. 1988)).  Additionally, credibility findings should be "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Kepler*, 68

F.3d at 391.  Nevertheless, the Tenth Circuit has "not reduced credibility evaluations to formulaic expressions: '*Kepler* does not require a formalistic factor-by-factor recitation of the evidence.  So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied.'"  *White v. Barnhart*, 287 F.3d 903, 909 (10th Cir. 2001) (*quoting Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000)).

In this case, the ALJ acknowledged that Plaintiff had described limited daily activities.  It appears that the ALJ did not credit this testimony, however, because Plaintiff's daily activities "cannot be objectively verified" and because Plaintiff had been able to fly to California to visit her daughter and had also traveled once to Hawaii.  Further, the ALJ found it significant that Plaintiff sometimes testified that she "didn't do" various activities rather than that she "couldn't do" the activities in question.

Additionally, the ALJ states that the ME who testified telephonically at the hearing held on September 8, 2005, "seemed to strongly believe that the claimant could do virtually a full range of light work" and that the ME "explained a great deal away."  AR 610.  The ALJ does not specify the issues that were "explained away" by the ME.  When questioned as to the meaning of "mild spinal stenosis," however, the ME explained that spinal stenosis is a narrowing of the spinal column diagnosed by an MRI or CT scan.  If the spinal cord takes up more than two-thirds of the spinal column, according to the ME, a patient would be "close to developing myelopathy."  AR 867.  The ME stated that stenosis, without symptoms, does not prove a patient has myelopathy.  When questioned by Plaintiff's representative about Plaintiff's diagnosis of "disk herniation" consistent with "C5, 6 chronic cervical

10

radiculopathy," AR 870, the ME pointed out that the MRI showed disk herniation on the right side of Plaintiff's neck, but that the occasional numbness she had described was in her left hand.  The ME stated that "you can have asymptomatic disk herniation."  AR 871.

Even though the ME may have "explained away" the diagnosis of left radiculopathy, the medical records indicate that for several years, beginning even before the alleged onset date, Plaintiff had complained of numerous severe headaches on the right side of her head as well as back and neck pain.  The ME did not reconcile his statement concerning "stenosis without symptoms" and "asymptomatic disk herniation" with the pain and headaches Plaintiff suffered.  The ME did not  discuss Plaintiff's history of headaches in detail.  He stated only that an MRI taken in 2005 before the hearing showed that Plaintiff also had sinus disease, at least at the time the MRI was taken.  AR 884.  By stating that "it might have helped her if they would have treated [the sinus disease] a lot earlier," the ME insinuated that Plaintiff's headaches may all have been caused by sinus disease.  The ME's attribution of Plaintiff's headaches to sinus disease is not, however, supported by the medical record.  The medical record is replete with references to Plaintiff's chronic headaches, but the ME relied solely on the 2005 MRI to support his contention that Plaintiff suffered from sinus disease.

In 1994, Plaintiff consulted Dr. Palmer with complaints about a rather continuous, right-sided posterior headache.  Dr. Palmer diagnosed Plaintiff with high blood pressure and possible neurologic-type headache.  AR 186.  In an effort to reduce pain and restore function of Plaintiff's cervical spine, Dr. Palmer referred Plaintiff to John Pangburn, R.P.T., for physical therapy in October 1994.  Plaintiff reported to the physical therapist that her neck

11

problem began around March of 1994, and that she had experienced increasing cervical spine pain and numerous headaches since then. AR 184. On the last day of treatment, the physical therapist wrote that Plaintiff had demonstrated a reasonable degree of progress and that her headaches were a little less severe and less frequent. He also stated, however, that Plaintiff continued to report significant symptomatic complaints of cervical pain and dysfunction. AR 181.

On October 26, 1994, Plaintiff saw Dr. Gregory S. Conner for a neurological consultation. Dr. Conner noted a history of nearly daily headaches over the previous three weeks. Plaintiff reported that the headaches often woke her from sleep and that they radiated from the right side of the base of her skull to her temple. Dr. Conner documented Plaintiff's high blood pressure, and the medication she had been taking. Plaintiff's general and neurologic examinations were normal, and Dr. Conner's diagnosis was probable migraine headaches with her high blood pressure exacerbating her symptoms to some degree. AR 195-196.

Plaintiff began seeing a chiropractor at Bristow Chiropractic on February 2, 1995, with complaints of headache and neck pain. She reported that she could not lie on her back or right side, and that at first, nothing would help the pain, but that she had recently discovered that Vicodin would relieve her pain. The examination revealed that Plaintiff's active cervical flexion, active cervical rotation and active cervical lateral flexion were within normal limits but her active cervical extension was restricted by pain. The doctor recommended low force adjustments three days per week over the next two to five weeks.

On February 10 and 15, 1995, Plaintiff reported that her symptoms were decreasing. On February 17, 1995, Plaintiff reported that she had a headache, and the assessment was that her condition had been aggravated. AR 201-205.

On January 20, 1995, Dr. Conner referred Plaintiff to Dr. James W. Carley. Dr. Carley's examination of Plaintiff's head and neck revealed mild swelling and tenderness of the right submandibular area, which he noted was probably sialoadenitis (inflammation of a salivary gland). His diagnosis was submandibular sialoadenitis, hypertension, and chronic right-sided headaches. He prescribed Vicodin with instructions for Plaintiff to take ½ tablet as needed for headache. On February 24, 1995, Plaintiff returned to Dr. Carley. His assessment was recurrent headaches, probably caused by muscle contraction. After reviewing her records and x-rays from Dr. Conner, Dr. Carley started Plaintiff on Cataflam. Plaintiff followed up with Dr. Carley about her headaches on April 25, 1995, reporting that she was sleeping better and feeling better since she had started taking Flexeril. She reported memory lapses, stress at work, and high blood pressure. Dr. Carley changed Plaintiff's blood pressure medication because the forgetfulness she reported could have been caused by the blood pressure medication she had been taking. Plaintiff returned on May 12, 1995, reporting that her headaches were better, and her blood pressure was "fine." On July 27, 1995, Plaintiff requested a refill of Vicodin, but Dr. Carley prescribed Ultram instead. On August 7, 1995, Plaintiff reported that the Ultram made her "very high" and again requested Vicodin. Dr. Carley recommended that Plaintiff see a headache specialist regarding her pain and medication. AR 228-232.

13

On November 14, 1995, Plaintiff saw Dr. Carley for a follow-up examination. Plaintiff reported that she was taking Flexeril rather than Elavil, and was also taking Vicodin as needed.  She stated that physical therapy was not helping her and that the drive to Blackwell, Oklahoma for her physical therapy appointments was making her condition worse.  Dr. Carley noted that Plaintiff had lost weight and that her blood pressure was acceptable.  His assessment was hypertension, cervical muscle spasm and pain (especially in the right lateral neck), degenerative disc disease of the cervical spine, and chronic headaches. He prescribed home cervical traction.  Dr. Carley also scheduled an appointment for Plaintiff with Dr. Kent Smalley.  AR 227.

Plaintiff saw Dr. Smalley on October 10, 1995.  He reviewed earlier x- rays which showed degenerative involvement of the C6-7 level, with narrowing of the disk space and mild anterior and posterior spurring.  Dr. Smalley's initial evaluation was that Plaintiff's headaches sounded like cervicogenic headaches, secondary to cervical degeneration with possible greater occipital nerve involvement and possible fibromyalgia.  He recommended a conservative treatment of trycyclics, NSAIDS, Flexeril or other antispasmodics, narcotics as needed and physical therapy and massage.  He also recommended that Plaintiff limit repetitive motion of the neck and asked Plaintiff to consider wearing a soft cervical collar. If conservative treatment failed, Dr. Smalley recommended trigger point and great occipital nerve injections followed by aggressive physical therapy.  AR 276-277.

Plaintiff received physical therapy at Blackwell Regional Hospital and at St. Joseph Regional Medical Center in October and November 1995. AR 209-213, 214-16.  Plaintiff

began physical therapy treatment at St. Joseph but discontinued treatment because of lack of insurance coverage.  AR 214.  On November 15, 1995, Plaintiff cancelled her appointments at Blackwell Regional Hospital, claiming that the treatments made her feel worse.  AR 210.

Plaintiff returned to Dr. Carley on September 6, 1996, requesting refills of her medication.  She complained about pain in her back.  Dr. Carley told Plaintiff that he would not prescribe narcotics and recommended that she should see her neurologist for that decision.  AR 223-224.

In October 1996, Plaintiff was examined by Phillip J. Knight, M.D., for a workers' compensation evaluation of the neck and back.  Dr. Knight stated that Plaintiff would need "continuing and constant palliative care in the nature of medication."  He also believed that she would need physical therapy, chiropractic care, "and perhaps other modalities of treatment."  AR 252-254.

Plaintiff saw Dr. Smalley again on October 10, 1996.  She stated that both her low back and cervical pain were worse.  His diagnosis was cervical degenerative disc disease, lumbar spine degeneration, and depression.  AR 274.

On November 19, 1996, Dr. David A. Fell, a neurological surgeon, reported the results of his evaluation of Plaintiff to Dr. Smalley.  Dr. Fell reviewed an MRI scan of the cervical spine taken on October 28, 1996.  He stated that Plaintiff's disc at the C5-6 level appeared to be herniated and also appeared to be mildly indenting her spinal cord.  Dr. Fell suspected a herniated disc at C5-6.  Dr. Fell stated that Plaintiff was also describing symptoms

consistent with a left C7 radiculopathy.  He recommended a cervical myelogram and CT scan of C4-T1, but Plaintiff was reluctant to consent to the study.  AR 246-247.

Dr. Brent N. Hisey examined Plaintiff for a workers' compensation evaluation.  Dr. Hisey's opinion was that Plaintiff was suffering from mechanical upper cervical spine pain and cervical discogenic pain syndrome at C5-6 and C6-7 with a mild component of mechanical low back pain.  He recommended a cervical discography at C3-4, C4-5, C5-6 and C6-7 to further elucidate the mechanism of her pain.  He restricted her weight lifting to 10 pounds.  He also stated that Plaintiff should avoid repetitive motion of the cervical spine.  AR 290-291.

On February 13, 1997, Plaintiff was evaluated by a consultative physician, Dr. R.F. Morgan.  Dr. Morgan stated that Plaintiff showed no atrophy or weakness of any extremity or joint, but that she refused to bend or allow her trunk or neck to be bent or moved in any direction.  He stated that touching and light manipulation caused her pain in the neck and lower back.  The neurologic exam was normal.  Dr. Morgan found chronic cervical degenerative arthritis and degenerative arthritis of the lumbar spine with chronic lumbar strain.  Straight leg raising was positive for pain, both sitting and lying.  Although there was no sensory loss or muscle spasm in either the lumbosacral or cervical spine, Dr. Morgan stated that Plaintiff suffered pain and tenderness.  AR 255-260.

On February 18, 1997, Dr. Knight again evaluated Plaintiff for workers' compensation purposes.  Dr. Knight also found decreased range of motion in the back in all planes, depressed deep tendon reflexes, and diminished strength.  Heel and toe walking and straight

leg raising were positive.  Dr. Knight also found decreased range of motion in the neck in all planes.  He agreed that the Plaintiff needed further diagnostic treatment and work up including a cervical discogram.  AR 248-250.

On February 28, 1997, a medical consultant, Dr. Thurma Jo Fiegel, prepared an assessment of Plaintiff's RFC.  Dr. Fiegel found that Plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds, and that she could stand/walk/sit for six of eight hours, and had an unlimited ability to push/pull.  AR 265.  By way of explanation, Dr. Fiegel noted cervical disc disease was documented by Plaintiff's MRI in October of 1996 but stated that at her consultative exam, Plaintiff had refused active and passive range of motion tests of her neck and back.  Nevertheless, Dr. Fiegel found that Plaintiff's hip flexion was 90˚ bilaterally when lying on the back, and that there was decreased range of motion of the shoulders bilaterally.  She noted full grip strength and normal gross and fine manipulation.  Dr. Fiegel stated that Plaintiff had no atrophy or sensory loss, and that although she had tenderness, there was no muscle spasm.  She stated that Plaintiff had no neurological deficits and that Plaintiff walked one mile, two to three times a week.  Finally, Dr. Fiegel noted that it was reasonable for Plaintiff to be experiencing pain with her cervical disc disease, but she stated that the evidence did not support Plaintiff's claims of limitations.  Dr. Fiegel found no postural, manipulative, visual, communicative, or environmental restrictions, except that Plaintiff was to perform no overhead reaching.  AR 264-271.

On April 7, 1997, Plaintiff underwent a cervical discogram performed by Dr. Stephen A. Andrade.  AR 292-97.  In a report dated April 23, 1997, Dr. Hisey reported that Plaintiff's

cervical discogram produced concordant neck pain at C4-5, and produced concordant neck and interscapular pain at C5-6.  AR 289.  The injections at C3-4 and C6-7 did not, however, show any pain production.  Dr. Hisey stated that Plaintiff's options would be to undergo a C4-5 and C5-6 anterior cervical diskectomy and fusion.  He apparently explained to Plaintiff that the greatest risk of the procedure would be that it might not significantly change her total pain picture.  If she did not have the surgical procedure, he recommended a permanent 20 pound weight lifting restriction, with no repetitive motion of the cervical or lumbar spine. AR 289.  In May 1997, Plaintiff informed Dr. Hisey that she did not want to undergo the surgical procedure.  AR 288.

On May 5, 1997, Dr. Smalley wrote a letter "summarizing [Plaintiff's] case."  He stated that Plaintiff had not responded to conservative medical therapy, that she continued to have problems with neck pain and headaches, and that she had had multiple diagnostics but refused to undergo further diagnostic testing.  He found that she suffered from cervicogenic headache, most likely related to cervical degenerative disease and cervical radiculitis.  He also noted that she suffered from limb pain and neck pain, myofascial pain, and poor posture related to her pain.  Finally, he noted that she suffered from occasional migrainous like headaches triggered by neck pain.  AR 272-273.

In a letter dated July 1, 1997, Dr. Bruce A. Mackey reported that he had seen Plaintiff three times for evaluation: once on May 16, 1997, once on May 30, 1997 and again on June 27, 1997.  Dr. Mackey stated that, based on his functional capacity evaluation, Plaintiff could sit, stand, or walk no more than two hours each in an eight-hour workday, and that she could

not climb or stoop at all.  He stated that she could lift ten pounds or less but could not do significant lifting over ten pounds.  He stated that she could use her head and neck "in a static free position," but would not be able to tolerate frequent flexing or rotating.  He found that she could not use her hands or feet at all for repetitive actions, and "is just unable to tolerate any prolonged physical activity."  He said that in his opinion she was totally disabled from any gainful employment.  Attached to Dr. Mackey's letter was a functional capacities evaluation detailing these findings.  AR 283- 285.

In a note from January 1998, Mr. Todd McAreavey, RPT, reported that physical therapy was continuing to cause initial increased discomfort "per her failed back syndrome" but that she wished to continue therapy in hopes of obtaining some level of the satisfactory recovery that she had previously experienced through therapy.  AR 473.  In February and March 1998, he reported that therapy was providing some relief. AR 470, 471.  In April, Mr. McAreavey reported that Plaintiff had begun some strengthening exercises and that he was generally pleased with her progress.  He stated, however, that Plaintiff's progress would be slow because of chronic dysfunction.  AR  469.

In a report to Plaintiff's attorney dated August 11, 1998, Dr. Mackey noted that he had seen Plaintiff over the last few months and that her neck and back pain as well as her depression were worse.  He did state, however, that Plaintiff's depression was somewhat improved with antidepressant medication.  AR 298.  Dr. Mackey saw Plaintiff again on May 21, 1999.  She was complaining of pain in her neck.  Dr. Mackey noted decreased range of motion in the neck, but good grip and use of hands.  His assessment was chronic neck pain

with some increased radicular symptoms.  AR 387.  Dr. Mackey ordered an MRI of the cervical spine which was conducted on July 29, 1999.  The MRI revealed a circumferential disc bulge at C5-C6 and disc degeneration at C6-C7.  AR 384.

In a report dated January 31, 2000, Dr. Hisey reported that he had examined Plaintiff for evaluation of her cervical spine.  He compared MRI scanning done in 1999 with that done in 1996, and noted that although the disk spaces appeared the same, there was an increasing kyphotic curve to the cervical spine which demonstrated a structural change for the worse. He noted her report that Ultram and Trazadone helped her pain.  Plaintiff also reported that she was trying a new therapy called "Hellerwork," a deep massage therapy.  Plaintiff stated that Hellerwork had helped her pain significantly.  Dr. Hisey's examination revealed motor function of 5/5 in the deltoids, biceps, triceps, grip, and hand intrinsic musculature.  Her reflexes were 1+, and she was tender in the posterior cervical region.  He felt that she was able to work with a ten pound lifting restriction and no repetitive motion of the cervical spine.  AR 325-326.

On May 5, 2000, Plaintiff was seen again by Dr. Knight for evaluation of her neck "with consequential psychological overlay."  On examination of the neck, Dr. Knight found decreased range of motion in all planes.  AR 336-338.

Plaintiff saw Dr. Mackey on May 12, 2000, and he reported that she was in good spirits, seemed more hopeful, and was less depressed.  He prescribed Paxil.  AR  371. Plaintiff returned to Dr. Mackey on July 17, 2000, reporting that she had returned from California.  She reported that she was getting deep tissue massages twice a week and was

20

participating in water exercise five times a week.   Dr. Mackey's assessment was fibromyalgia. AR 370.  On September 8, 2000, Dr. Mackey wrote a letter in which he noted that Plaintiff had difficulty with degenerative disc disease of her cervical spine and degenerative arthritis of her low back with "failed low back syndrome."  He also noted that "Patient has also developed chronic fibromyalgia syndrome, and she basically hurts all over." He continued that she managed pretty well with regular water exercises and therapeutic massage, and "manages to do routine activities of daily living without any significant narcotic medications."  He noted that she was on chronic antidepressants, that she took Trazadone to help her sleep and that she took Neurontin for her chronic pain syndrome.  AR 368-369.

Dr. Mackey referred Plaintiff for physical therapy in November of 2000.  Although she was to attend therapy three times a week for four weeks, she only attended therapy once. She apparently told the physical therapist that she could not afford the $10 co-pay.  AR 365-366.   On August 27, 2001, Plaintiff reported to Dr. Mackey's office that she had had an automobile accident over the weekend.  She was complaining of neck, back, and left shoulder pain.  AR 494.  Dr. Mackey ordered x-rays of the cervical, thoracic, and lumbar spine, as well as the left shoulder.  The x-ray of the cervical spine showed no prevertebral edema or fractures, moderate degenerative changes at C5-C7, with some disc space narrowing, but no foraminal encroachment.  The thoracic spine x-ray showed mild degenerative changes with small anterior osteophytes, with no compression fractures.  The x-ray of the lumbar spine showed severe disc space narrowing, with no compression fractures.  The left shoulder x-ray

was negative. AR  503-504.  At the request of Dr. Mackey, Dr. Vaidya performed an EMG and nerve conduction study on August 28, 2001.  The findings were consistent with right C5-6 chronic cervical radiculopathy in addition to left  early carpal tunnel syndrome.  He recommended physical therapy, MRI of cervical spine, and a wrist splint for her left hand. AR 499.  Dr. Mackey again examined Plaintiff on August 31, 2001.  He diagnosed acute neck and back strain with muscle spasm, continued Plaintiff on Ultram, added Zanaflex and recommended lumbar physical therapy.  AR 493.

At the request of Dr. Vaidya, an MRI was performed on September 4, 2001.  The test revealed that Plaintiff's lordotic curve had straightened out[5] and that she had moderate disk degeneration at C5-6 and C6-7.  There was mild degeneration at C4-5, and disk level C5-6 was mildly retrolisthetic with posterior disk margin bulging and right side paracentral protruding causing minimal cord compression.  At C5-6, the spinal canal was borderline stenotic.  At the C6-7 level, there was mild bulging of the posterior disk margin, and a suggestion of a small, right sided paracentral protruding disk herniation, not well visualized. The spinal canal was not stenotic and the cord was not compressed.  At the C4-5 level, minimal retrolisthesis was noted, and the posterior disk margin was bulging only mildly.  The other disk levels were less remarkable.  There was no evidence of any significant foraminal stenoses.  AR 505-506.

_____

[5]Loss of the normal cervical lordotic curvature is a sign of degeneration in the neck.  Several studies have linked altered cervical curve configuration to the presence of chronic headache pain. *See* Banic, Leslie: *Chiropractic and Headache*, www.currenthealtharticles.com (*citing* Braff, M.M. and Rosner, S. *Trauma of the Cervical Spine as a Cause of Chronic Headache*: J. Trauma. 1975 p. 22).

On September 24, 2001, Plaintiff returned to Dr. Mackey, complaining that her neck and back were about the same. The diagnosis was neck, left shoulder, and low back sprain, with significant underlying disc disease. Plaintiff was told to continue her physical therapy. AR 492.

The objective medical record provides significantly more than a "loose nexus" between the pain Plaintiff alleged she was suffering and pain-producing impairments in her cervical and lumbar spine. Although the ALJ stated that he had "given full consideration" to Plaintiff's subjective complaints under *Luna* and *Kepler*, his written decision does not support that assertion. The evidence in the medical record instead supports a conclusion that the ALJ's decision is based primarily on the fact that Plaintiff was able to make two lengthy trips and on the assessment of the non-examining ME, and that the ALJ failed to consider other relevant factors supported by substantial medical evidence. On remand, Plaintiff's credibility should be thoroughly reassessed in accordance with the required legal standards for analyzing a claimant's subjective allegations of pain.

## C.     The ALJ's Assessment of Plaintiff's Residual Functional Capacity

Having failed to adequately analyze the opinions of Plaintiff's treating physicians and Plaintiff's own testimony regarding her pain, the ALJ determined that Plaintiff retained the RFC to perform her past relevant work classified as light work. Specifically, the ALJ found that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, could stand or walk six hours in an eight-hour workday and could sit six hours in an eight-hour workday. He further found that Plaintiff could climb stairs frequently, balance occasionally, stoop

occasionally, and kneel, crouch or crawl occasionally.  He found that Plaintiff could do no overhead reaching.  Plaintiff challenges the ALJ's RFC assessment.  The Court need not address this issue, however, because this case must be remanded for proper analysis of the treating physician's opinions and Plaintiff's credibility.  The proper analyses of these issues on remand will necessarily require the ALJ to reassess Plaintiff's RFC.

The decision of the Commissioner is REVERSED and REMANDED for further proceedings consistent with this opinion.

ENTERED this __16th__ day of February, 2006.


_____
VALERIE K. COUCH
UNITED STATES MAGISTRATE JUDGE